IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

WALTER B. HOYE, II,

               Plaintiff-Appellant,

vs.

CITY OF OAKLAND,

               Defendant-Appellee.

No. 09-16753

D.C. No. 3:07-cv-06411-CRB
(Northern California)

=================================================
ON APPEAL FROM THE ENTRY OF FINAL JUDGMENT
IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF CALIFORNIA
HONORABLE CHARLES BREYER, PRESIDING

**Reply Brief** of Plaintiff-Appellant Walter B. Hoye II

Michael Millen
Law Offices of Michael Millen
119 Calle Marguerita #100
Los Gatos, CA  95032
(408) 871-0777  / (408) 866-7480 [fax]

Catherine W. Short
Life Legal Defense Foundation
P.O. Box 1313
Ojai, CA 93024
(805) 640-1940

# TABLE OF CONTENTS

INTRODUCTION ....................................................................................... 1

RESPONSE TO STATEMENT OF FACTS ..................................................... 2

    *A. CWLC's Statement of Facts Is At Odds With the Record* ........................... 2
    *B. The Ordinance Was Not Enacted to Address Violence.* ............................. 4

ARGUMENT ............................................................................................. 7

  I. THE ORDINANCE IS UNCONSTITUTIONAL ON ITS FACE BECAUSE IT IS
  CONTENT AND VIEWPOINT-BASED .................................................. 7

    *A.   None of the City's Arguments Disproves the Ordinance's Content-Based
    Nature* ....................................................................................... 7
    *B. The Ordinance Imposes an Unconstitutional Speaker-Based Distinction.* ..10
    *C. The Ordinance is a regulation of speech.* ...................................13
    *D. The City Has Confounded the "Secondary Effects" Doctrine with the
    Supreme Court's Jurisprudence on "Incidental" Effects on Speech* ..............14
    *E. The City Confounds "Category of Speech" with "Category of Speech-
    Related Conduct."* ........................................................................16
    *F. Plaintiff's Facial Challenge Is Supported By Both Its Deposition Testimony
    and the Its Admissions in Its Briefs* .................................................18

  II. THE ORDINANCE IS UNCONSTITUTIONAL AS APPLIED. ..............................22

    *A. The Ordinance is Viewpoint-Based.* .........................................22
    *B. As Applied, the Ordinance Fails to Leave Open Ample Alternatives and Is
    Not Narrowly Tailored To Serve A Significant Governmental Interest.* ..........25
      1. Interference by Escorts Prevents Effective Communication Under the
      Ordinance. ................................................................................25
      2. The City Distorts the Purported Record of "Successful" Communication
      Under the Ordinance. ...................................................................28
      3. While Denying Plaintiff the Ability to Effectively Communicate His
      Message, the City Demands Special Accommodation for Abortion Clinics ..30
    *C. The Ordinance Is Not Narrowly Tailored.* .................................31
      1. The Ordinance Was Directed at Hoye's Activity, Not That of Phantom
      Protestors. ...............................................................................31
      2. More Precise Means of Serving the Asserted Interests Are Available. .....36
      3. The Record Showed No Inadequacy in Existing Laws or Enforcement. ...36
  III. THE ORDINANCE IS UNCONSTITUTIONALLY VAGUE. ..............................37

IV.  THE LOWER COURT ERRED IN GRANTING SUMMARY JUDGMENT TO THE CITY. .................................................................................................39

V. RELIANCE ON EUROPEAN OR CANADIAN LAW IS INAPPROPRIATE............42

VI. CWLC MISREPRESENTS THE FINDINGS OF THE CITED STUDIES..............45

VII. AMICI CANNOT RECONCILE THE DATA WITH THEIR CONCLUSION ........47

**CONCLUSION** ................................................................................................**48**

**STATEMENT REGARDING LENGTH  (FED. R. APP. P. 32 (A)(7)(C) AND NINTH CIRCUIT RULE 32-1)**........................................................................**50**

# TABLE OF AUTHORITIES

**Cases**

*ACLU of Nevada v. Las Vegas*, 466 F.3d 784, 793 (2006) ...............................7, 15

*American Academy of Pediatrics v. Lungren*, 16 Cal.4[th] 307 (1997) ....................48

*Berger v. Seattle*, 569 F.3d 1029 (9th Cir. 2009)........................................10, 13, 37

*Carolina Power & Light Co. v. Uranex*, 451 F.Supp. 1044 (N.D. Cal. 1977)........34

*Citizens United v. Federal Election Commission*, 558 U.S. ___, 175 L. Ed. 2d 753
   (Jan. 21, 2010), No. 08-205 ..................................................................................10

*City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789 (1984).........44

*Edwards v. Coeur d'Alene*, 262 F.3d 856 (9th Cir. 2001)........................................35

*Foti v. Menlo Park*, 146 F.3d 629 (9th Cir. 1998)...................................................23

*G.K. Ltd. Travel v. Lake Oswego*, 436 F.3d 1064 (9th Cir. 2006).......................9, 22

*Hill v. Colorado*, 530 U.S. 703 (2000)...................................................................... 8

*Jacobs v. Clark Co. Sch. District*, 526 F.3d 419 (9th Cir. 2008)............................15

*Long Beach Area v. City of Long*, 574 F.3d 1011 (9th Cir. 2009)..........................22

*Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425 (2002) ...................................14

*Project 80's Inc. v. Pocatello*, 942 F.2d 635 (9th Cir. 1991).................................36

*R.A.V. v. St. Paul*, 505 U.S. 377 (1992).........................................................28, 44

*Ridley v. Mass. Bay Transp. Auth.*, 390 F.3d 65 (1st Cir. 2004) ...........................10

*Singh v. Gonzales*, 491 F.3d 1019 (9th Cir. 2007)..................................................33

*Tucson Women's Center v. Arizona Medical Bd.*, 2009 U.S. Dist. LEXIS 95275
   (D.Ariz. 2009) ...................................................................................................46

*U.S. v. O'Brien*, 391 U.S. 367 (1968)......................................................................15

*Ward v. Rock Against Racism*, 491 U.S. 781 (1989).............................................. 7

**Statutes**

Cal. Evid. C. §664........................................................................................... 6

F.R.E. 301-302.................................................................................................. 6

San Jose Municipal Code §10.08.030..................................................................36

**Other Authorities**

28 NURSING FORUM Issue 1 (1993)................................................................46

Jacot et al., A Five-year Experience with Second-Trimester Induced Abortions: No
   Increases in Complication Rate as Compared to First Trimester, 168[2] Am. J.
   Obstet. Gynecol. 633 (Feb. 1993). ...................................................................48

Revised Statutes of British Columbia (R.S.B.C.) 1996, c. 1 .................................44

# INTRODUCTION

The issue is joined. The City has made uncontrovertibly clear that the Ordinance, as enacted, interpreted, and applied by the City, is content, viewpoint, and speaker-based: "It is official City policy to allow escorts to approach patients within eight feet without consent so long as they are acting to facilitate access to clinics. . . . It is also official City policy to allow escorts, acting as escorts, to engage in speech incidental to facilitating patient access." Opposition Brief of Appellee City of Oakland ("Oppo.") at 37.  The City's "fair reading" of the Ordinance to exclude from its prohibition "speech incidental to facilitating access to medical services, while including advocacy and persuasion" renders the Ordinance content- and viewpoint-based **on its face**. Oppo. at 31-32.

The City's use of the term "facilitating access" is elucidated in the record to mean telling women not to listen to Walter Hoye, not to take his information, that his information is misleading, and that he is only there to hurt them. The City groups all of these statements under the heading of "nonadvocacy," while Mr. Hoye asking "May I talk to you about alternatives to the clinic?" is forbidden advocacy.

Indeed, every argument the City proffers circles back on itself, being based on the flawed premise that the Ordinance is content-neutral in permitting speech that

"facilitates access" to the clinic while prohibiting "advocacy" or "persuasion" as defined by the City itself.

The City also fails to deal with the lack of a factual record justifying the Ordinance, relying instead on conclusory assertions and misstatements of the record. It also glosses over the undisputed evidence of activist escorts exploiting the Ordinance and their immunity under it to cut-off communication between Hoye and his audience.

## RESPONSE TO STATEMENT OF FACTS

### A. CWLC's Statement of Facts Is At Odds With the Record

The City's Statement of Facts is discussed throughout this Reply. The brief of Amici California Women's Law Center et al. ("CWLC Brief") supplemented and embellished the City's statement of facts with "facts" not found in the record.

CWLC states that abortion patients "regularly" meet with aggressive invasions of personal space, are "routinely verbally abused and physically threatened." They also state that it was "common for" patients to call into the clinic from their cars. CWLC Brief at 11-12. Nothing in the record supports these contentions. Indeed, the City's declarants quite skillfully avoided specifying either the frequency or the point or period of time when incidents like this occurred, by employing formulations such as "I have seen," "I have observed," "I have heard,"

and "patients have said." Although the deliberate implication is that these were regular occurrences before the Ordinance passed, the declarants did not say so, and in at least one instance, the City admitted that the implication was false.[1]

CWLC also states, "[Hoye], himself, approached within two feet of patients to hand out fliers and harass them." CWLC Brief at 11, citing Oppo. at 8. The City's brief states only that "five separate witnesses" said that this happened, and only one of these witnesses, Barbic, has testified about April 29. In her sworn declaration, she says only that Hoye was within 8 feet. In fact, the video of April 29, 2008, shows the inaccuracy of all of these witnesses' statements to the police. The video also proves the falsity of CWLC's characterization of Hoye's conduct as "undeniably aggressive and intimidating." CWLC Brief at 11. The video footage shows that Hoye's demeanor toward patients is peaceful and non-threatening.

CWLC asserts that an escort "announces his or her name, states that he or she is a clinic escort, **asks permission to approach the patient**, and assists her to the entrance of the facility." (CWLC Brief at 34) (emphasis added). However, the

---

[1] Clinic director Barbic stated, "For my personal safety, I would open an umbrella and hold it over my head or around my body to shield myself from the protestors. " ER197. When Hoye pointed out that Barbic's own testimony was that she parked in the clinic's parking lot and did not use the street entrance, the City responded by referring to her testimony that "she once shielded herself with an umbrella." Thus, what Barbic's declaration implied was a regular occurrence turned out to be a single incident, date uncertain. SER158.

City's clearly stated position is that escorts are permitted under the Ordinance, and do in fact, approach patients **without consent** and speak to them. See, e.g., Oppo. at 32, 37; ER257.  Premised upon such a misapprehension of the undisputed facts, CWLC's analysis is not helpful in resolving the issues presented by this case.

### B. The Ordinance Was Not Enacted to Address Violence.

Both the City and the amici raise the specter of an epidemic of violence directed against abortion clinics, providers, and to a notably lesser extent, patients. In the context of the actual provisions of the Ordinance, this is window dressing, intended solely to prejudice the Court.  Even the City has not argued that the Ordinance was enacted to prevent, deter, or punish acts of violence; such acts are already prohibited by layers of federal and state law. The preamble to the Ordinance nowhere references violence, but instead asserts the need to prevent "harassing and intimidating" behavior. Thus, assertions such as that by CWLC that "The Ordinance is necessary because 'physician so fear for their safety that they wear bulletproof vests when entering and exiting the clinic'" are both factually absurd and legally untenable.[2]

---

[2] *See also* Planned Parenthood Brief at 21 ("bubble ordinances , . . are essential to protecting health center physicians, employees, and volunteers").

To the extent the City and amici wish to draw a correlation between the presence of violence and the frequency and/or intensity of "harassing and intimidating" behavior at abortion clinics, the correlation undercuts their position. First, as shown in the Feminist Majority Foundation survey cited by Planned Parenthood (at 8), CWLC (at 14, 29, and 30), and Center For Reproductive Rights ("CRR") (at 1), violent crime at abortion clinics has dramatically **decreased** in the past 15 years. Second, in contrast the statistics presented in the nationwide surveys of clinic violence presented by amici, Oakland appears to be an oasis of safety. Despite its repeated invocations of violence, the evidentiary record is strikingly lacking in evidence of violence, or even minor property damage, at any Oakland clinic in the past 20 years.[3]

This is consistent with the experience of California as a whole. According to the Attorney General's annual reports on "Anti-Reproductive Rights Crimes in California," published pursuant to Pen. C.§13776, there were a total of five anti-reproductive rights crimes in California in 2008, six in 2007, and four in 2006. Of these crimes, the majority were non-felony, non-violent crimes. In the six years

---

[3] One exception is the account clinic director Barbic fabricated at Hoye's trial, in which she claimed that Hoye threateningly approached her. ER772-ER773. Her testimony was so discredited on cross-examination by the video evidence that she did not bother repeating the allegation in her declaration. ER199.

covered by the reports, the single reported anti-reproductive rights crime in Alameda County pertained to Mr. Hoye allegedly violating the Ordinance.[4]

Planned Parenthood alone operates more than 100 clinics in California (PP Brief at 6), and there are numerous other California abortion clinics not associated with Planned Parenthood. Thus, a given abortion clinic in California is unlikely to experience an anti-reproductive rights crime more often than once a decade, and a crime of violence only once in several decades.

Thus, to the extent there is any correlation between violence and "harassing and intimidating" protest activity at abortion clinics, the evidence indicates that in California, the rate of such activity is far, far lower than the national averages found in the industry-generated studies proffered by the amici.

---

[4] The six reports (2003 – 2008) are available at http://ag.ca.gov/cjsc/pubs.php#anitiReporductiveRights [sic] Planned Parenthood argues that "the number of anti-reproductive rights crimes is underreported" (Planned Parenthood Brief at 19). Given that the Attorney General's report covers such minor incidents as "assault" with a pamphlet (2006 Report, p.2), it strains credulity that the reports overlook significant numbers of more serious crimes. On the contrary, "[i]t is presumed that official duty has been regularly performed." Cal. Evid. C. §664; F.R.E. 301-302.

**ARGUMENT**

I. THE ORDINANCE IS UNCONSTITUTIONAL ON ITS FACE
    BECAUSE IT IS CONTENT AND VIEWPOINT-BASED.

**A. None of the City's Arguments Disproves the
Ordinance's Content-Based Nature**

Although, as the City notes, *Ward v. Rock Against Racism*, 491 U.S. 781,
798-99 (1989), held that the "principal inquiry" concerning content-neutrality is the
government's intent (Oppo. at 15), this Court has added "That said, we are not
required to find a content-based purpose in order to hold that a regulation is
content-based." *ACLU of Nevada v. Las Vegas*, 466 F.3d 784, 793 (2006). Courts
also look to the enactment itself, including the government's authoritative
interpretation of the enactment.   The City has provided an authoritative
interpretation, in both its briefs and discovery. See Appellant's Opening Brief
("AOB") at 10-15, 57.

The City claims, "The Ordinance nowhere references the content or
viewpoint of speech." (Oppo. at 17.) This is patently false. The Ordinance
prohibits unconsented approaches "**for the purpose of counseling . . .**" ER61-62.
According to the City, "a fair reading of the Ordinance's definition of 'counseling'
excludes speech incidental to facilitating access to medical services,  while
including advocacy and persuasion." Oppo. 31-32. Thus, the City itself reads the

statute to prohibit or permit various speech according to its content (and, as discussed below, its viewpoint.) As this Court has stressed, even if a "distinction is innocuous or eminently reasonable, it is still a content-based distinction because it singles out certain speech for differential treatment based on the idea expressed." *ACLU of Nevada v. Las Vegas*, 466 F.3d. at 794 (internal quotations omitted.)[5]

The City incorrectly claims the Supreme Court in *Hill v. Colorado*, 530 U.S. 703 (2000), "explained that statutes, like the Ordinance here, that require an officer to look of communications 'to determine whether a rule of law applies to a course of conduct' remain content-neutral." Oppo. at 15-16, 17. The Court, of course, gave no such general absolution on the issue of content-neutrality. The Court said that the necessity of examination of contents of a communication is not **of itself** improper. Id. at 721. The "rule of law" under consideration may nevertheless be, like the Ordinance here, unconstitutionally content and/or viewpoint based.

This Court has held that proof that a police "officer must read it" is "persuasive" evidence of a regulation being content-based. *ACLU,* 466 F.3d. at 796 n.12. The only exception this Court noted was where the regulation did not

---

[5] The City's purported disinterest in the content of the protestors' speech is also belied by its focus on the allegedly "explicit" and "misleading" content of the protestors' literature. Oppo. at 4

require "officials to evaluate the substantive message." *Id.* citing *G.K. Ltd. Travel v. Lake Oswego*, 436 F.3d 1064, 1079 (9th Cir. 2006).  An officer determining whether an escort's speech is "advocacy" or "persuasion" versus "facilitating access" clearly requires an evaluation of the substantive message.

The City's contention that the officer's examination need only be "cursory" does not, even were it true, resolve the issue.  Oppo. at 17-18. Frequently the more blatant the viewpoint discrimination, the more cursory the examination required. While an officer might struggle over whether certain speech was commercial or noncommercial, or whether greeting a patient with "Hi - It's a great day to be alive!" counts as "oral protest, education, or counseling" versus "random social conversation," the officer is under much less difficulty where he need only determine whether the speech is intended to encourage a woman to enter the clinic or dissuade her from doing so.  ER456:2-22. A cursory examination is not the same as a content-neutral examination.

The City also claims the "modesty of the ordinance" belies any suggestion that it is a pretext for viewpoint discrimination. Oppo. at 26.  However, "[v]iewpoint discrimination concerns arise when the government intentionally tilts the playing field for speech; reducing the effectiveness of a message, as opposed to repressing it entirely, thus may be an alternative form of viewpoint discrimination." *Ridley v.*

*Mass. Bay Transp. Auth.*, 390 F.3d 65, 88 (1ˢᵗ Cir. 2004). *See also Berger v. Seattle*, 569 F.3d 1029, 1052 (9th Cir. 2009) (that a regulation "only restricts, rather than completely bans, particular content makes it no more content-neutral").

None of the City's arguments disposes of the fundamental fact that, according to the City's own interpretation, the Ordinance is a content- and viewpoint-based restriction on speech.

### B. The Ordinance Imposes an Unconstitutional Speaker-Based Distinction.

The City facilely claims that the Ordinance "applies to **protestors** of all viewpoints." Oppo. at 19 (emphasis added). By interpreting the Ordinance to apply only to "protestors" -- as defined by the City -- the City exempts activist escorts from the reach of the Ordinance and creates an unconstitutional speaker-based distinction.

The Supreme Court very recently confirmed that the First Amendment's prohibition of viewpoint-based restrictions on speech encompasses speaker-based restrictions as well. In *Citizens United v. Federal Election Commission*, 558 U.S. ___, 175 L. Ed. 2d 753 (Jan. 21, 2010), No. 08-205, slip op. at 24 (emphasis added), the Court struck down campaign finance restrictions applicable to certain corporations, stating:

Premised on mistrust of governmental power, the First Amendment stands against attempts to disfavor certain subjects or viewpoints. See, *e.g., United States* v. *Playboy Entertainment Group, Inc.*, 529 U.S. 803, 813 (2000) (striking down content-based restriction). **Prohibited, too, are restrictions distinguishing among different speakers, allowing speech by some but not others.** See *First Nat. Bank of Boston* v. *Bellotti*, 435 U. S. 765, 784 (1978). **As instruments to censor, these categories are interrelated: Speech restrictions based on the identity of the speaker are all too often simply a means to control content**.

The City testified (without any objections interposed), that "the City's Enforcement Policy is not to enforce the Bubble Ordinance against escorts acting as escorts." ER431:19-23. In its brief, the City states forthrightly that it is "official City policy to allow escorts, acting as escorts, to engage in speech incidental to facilitating patient access." Oppo. at 37. The City thus distinguishes between (a) escorts walking up to a patient without consent, introducing themselves, explaining that their role is to help patients reach clinic entrances, and asking permission to assist her into the facility safely (Oppo. at 6; ER826:2-3)[6] and (b) Hoye walking up to a patient without consent, introducing himself, and asking if he can talk with her about alternatives to the clinic. As the Supreme

---

[6] The City's description puts the escorts' conduct in the most favorable light by excluding the undisputed facts in the record concerning escorts telling patients not to listen to Hoye, not to take his literature, and that he is only there to hurt them. AOB at 7-8.

Court warned, this speaker-based distinction is simply an instrument of censorship and a means to control content.

The Supreme Court continued:

> Quite apart from the purpose or effect of regulating content, moreover, the Government may commit a constitutional wrong when by law it identifies certain preferred speakers. By taking the right to speak from some and giving it to others, the Government deprives the disadvantaged person or class of the right to use speech to strive to establish worth, standing, and respect for the speaker's voice. The Government may not by these means deprive the public of the right and privilege to determine for itself what speech and speakers are worthy of consideration. The First Amendment protects speech and speaker, and the ideas that flow from each.

*Citizens United*, *id.* In the instant case, the Ordinance grants to "escorts acting as escorts" a preferred position in the marketplace of ideas, and deprives persons like Hoye, who oppose the status quo, of an equal opportunity to reach the minds and hearts of potential listeners and "to establish worth, standing, and respect" for their message. Moreover, as the Supreme Court noted, the constitutional wrong is committed not just against Hoye and others like him, but against the women entering the clinic, who are being denied the opportunity to receive his message on an equal footing with the escorts' messages encouraging them to enter the clinic.

## C. The Ordinance is a regulation of speech.

The City invokes a "key legal distinction" in its attempt to justify its exemption for escorts who approach patients to "facilitate access" to clinics. The City contends that "the Ordinance regulates conduct, not speech" because it "restricts no speech unless it occurs during prohibited conduct, namely, nonconsensual approaches." Oppo. at 19-20.

This is word play. The Ordinance does not prohibit nonconsensual approaches. Were he so minded, Hoye could freely walk right up to women approaching the abortion clinic and walk alongside them until they reach the clinic property. The Ordinance is violated **only when he attempts to communicate** with them. Indeed, any individual may approach patients without consent. A violation occurs only where there is an attempt to leaflet, picket, or engage in "oral protest, education, or counseling"). Moreover, escorts, with the City's blessing, systematically engage in the purportedly "offensive behavior" (Oppo. at 21) of approaching without consent.

This Court has already rejected a similar attempt to recast a restriction on speech as a restriction on conduct. In *Berger*, this Court considered a regulation that prohibited "actively solicit[ing] donations." Seattle argued that the ban was a regulation not of speech but of conduct, i.e., the exchange of money. This Court

disagreed, pointing out that the regulation "allows the conduct – exchange of money" but "regulates only the speech, by specifying the medium and manner of requesting money." *Berger,* 569 F.3d. at 1050-51.

In precisely the same way, the Ordinance here allows the supposedly "offensive behavior" (unconsented approaches of persons entering abortion clinics) but restricts speech. This renders the Ordinance a speech restriction which must be content-neutral.

### D. The City Has Confounded the "Secondary Effects" Doctrine with the Supreme Court's Jurisprudence on "Incidental" Effects on Speech

The City asserts that Plaintiff's discussion of the Supreme Court's "secondary effects" doctrine is "flatly incorrect." Oppo. at 21. On the contrary, the City errs in its analysis.

The secondary effects doctrine, which applies in the context of sexually-oriented businesses, holds that an otherwise content-based restriction on expressive activity may be deemed content-neutral if the restriction is justified by and directed at the "secondary effects" of the speech on other legitimate state interests. The concept is "something of a fiction." *Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 448 (2002) (Kennedy, J., conc., discussing *Renton v. Playtime Theatres, Inc.*, 475 U.S. 41 (1986)).

The City contends that the doctrine is applicable outside of sexually-oriented business cases, citing *U.S. v. O'Brien*, 391 U.S. 367 (1968). However, *O'Brien* was not a secondary effects case. Rather, it held that a law supported by interests unrelated to the suppression of speech was not invalid even if it caused an "incidental restriction" on some expressive conduct. *Id.* at 377. The Court stated that the relevant statute "deals with conduct having no connection to speech. It prohibits the destruction of certificates issued by the Selective Service System, and there is nothing necessarily expressive about such conduct. The Amendment . . . **does not punish only destruction engaged in for the purpose of expressing views."** *Id*. at 375 (emphasis added).[7] By contrast, under the Ordinance here, the prohibited act not only has a "connection" to speech but makes the intent to engage in expressive activity an element of the crime. The Ordinance does not punish all or most unconsented approaches, but **only** unconsented approaches "engaged in for the purpose of expressing views." *Id*.

The City next asserts that the Ordinance "is concerned with more secondary effects than just the 'emotive impact' of protestors' approaches" but also aims to

---

[7] Similarly, *Jacobs v. Clark Co. Sch. District*, 526 F.3d 419 (9th Cir. 2008), dealt with a school uniform policy which was a regulation directed at non-expressive conduct and having only an "incidental" impact on speech. *Id*. at 430, 434. In *ACLU v. Las Vegas*, contrary to the City's contention, this Court found that a ban on solicitation in a public square was **not** content-neutral, and struck it down

secure "women's health, access to medical care, and constitutional rights." Oppo. at 22. The breadth of this assertion illustrates the danger of letting the "secondary effects" genie out of the sexually-oriented business bottle. Governments could easily amass lists of "secondary effects" that would purportedly be mitigated by content-based restrictions on speech. Because of the obvious dangers, the Supreme Court has declined to allow them act on this impulse outside the confines of zoning restrictions on sexually-oriented businesses, as these restrictions have a "built-in legitimate rationale which rebuts the usual presumption that content-based restrictions are unconstitutional." *Alameda Books*, 535 U.S. at 449 (Kennedy, J., concurring).

### E. The City Confounds "Category of Speech" with "Category of Speech-Related Conduct."

The City purports to respond to Hoye's argument that the Ordinance is content-based because it regulates "only one category **of speech**," by citing to cases holding that government entities "may regulate one category **of speech-related conduct** without running afoul of the First Amendment." Oppo. at 24-25. Once more, the City is engaged in word play.

---

accordingly. 466 F.3d at 794.

Political speech, solicitation, and noncommercial speech are categories of speech. Residential picketing, erecting billboards, posting signs on telephone poles, using sound trucks, and sky-writing are categories of speech-related conduct. Ample Ninth Circuit and Supreme Court precedent establishes that governments may readily single out certain of the latter categories for regulation, but singling out the former categories frequently runs afoul of the First Amendment.

"Protest," "education," and "counseling" are categories of speech, not speech related conduct. An ordinance restricting only these categories is content-based, particularly as compared to the categories of speech left unregulated, such as vending and panhandling. The City's contention that "the Ordinance does regulate panhandling, solicitation, and vending to the extent these activities involved prohibited conduct" (Oppo. at 25) is circular: the Ordinance prohibits the activity to the extent it prohibits it. The "prohibited conduct" under the Ordinance is approaching without consent for the purpose of leafleting, displaying a sign, or engaging oral protest, education, or counseling. Someone approaching without consent "for the purpose of" asking for a dollar or selling a flower no more violates the Ordinance than someone approaching without consent for the purpose of

asking the time.  The Ordinance thus restricts noncommercial speech more than commercial speech.

### F. Plaintiff's Facial  Challenge Is Supported By Both Its Deposition Testimony and the Its Admissions in Its Briefs.

The City objects to Hoye's use of its deposition in support of his facial challenge to the Ordinance. Hoye responded to these same objections when raised by the City in the lower court.  ER784-85.  The City's attempt to dismiss the F.R.C.P. 30(b)(6) testimony of the person it selected to testify on its behalf as merely the testimony of  "a single City employee" is risible.  Similarly unavailing are the City's other objections.  The City never objected at the deposition that any question called for a legal conclusion.  Many of the questions were not objected to at all, nor were they outside the scope of a 30(b)(6) deposition, nor were the questions or answers speculative, incomplete hypotheticals, or "non-credible." *See, e.g.,*  ER416:13-23; 417:10-18; ER418:4-15; ER437 ("Our  policy is clear. That would not be a violation").

More importantly, the City's objection is pointless because it has never disavowed any specific part of the deposition testimony. On the contrary, in its briefs, it has corroborated every point relied on by Hoye.

The City admits that it is "official City policy to allow escorts to approach patients within eight feet without consent so long as they are acting to facilitate access" and it is also "official City policy to allow escorts, acting as escorts, to engage in speech incidental to facilitating patient access." (Oppo. at 37). This is the same position it expressed in its deposition. ER453:5-455:8 (escort speech is allowable because it is facilitating and makes a "patient feel safe"). What this means is that escorts and demonstrators are not treated equally under the Ordinance, and speech which attempts to dissuade a woman from entering the clinic is treated differently that speech which encourages her to enter.

Because the ordinance is not enforced against "escorts acting as escorts" who are facilitating access, the City does not consider it a violation for escorts to approach without consent and say, "Don't listen to the demonstrators" because that language "is used to help facilitate their entrance into the facility and maybe even their exit." ER433:5-25. Likewise, escorts saying "Don't take those leaflets" or "Those leaflets have inaccurate information in them" or "It's your right to have an abortion" are all examples of permissible escort speech, and neither the City nor any of its witnesses has ever contended otherwise.

Barbara Hoke, the City's declarant on the topic of the escort training and conduct, declared that the escorts follow strict guidelines. ER258, ¶9. These

guidelines include not letting demonstrators' literature into the clinic and "explaining" to patients that the demonstrators' literature is "intended to induce guilt and provide inaccurate information to unsuspecting clients." ER719; *see also* ER569:26-ER570:8; ER571:27-ER572:16 (Hoke testimony that escorts tell patients that the demonstrators information is "inaccurate, that it is invasive of their privacy, and that it is intended to prevent them from exercising their right to reproductive healthcare services").[8]

As to telling patients "It's your right to have an abortion," the City itself stated that "while statements like 'You have the right to an abortion' by an escort might arguably be beyond the scope of escorting in some hypotheticals," such a statement in other circumstances "would fall within facilitating patient access." ER823 n.2.

---

[8] Hoke is the same (and only) witness whose testimony the City cites in support of its contention that escorts do not counsel patients but rather "have a policy of not communicating pro-choice or other messages to patients." Oppo. at 33. In stark contrast to the generalized contentions in her declaration about escorts not counseling patients, her state court testimony about what escorts in fact say and are instructed to say to patients puts beyond dispute the fact that escorts engage in "advocacy" with the City's blessing under the guise of "facilitating access." The City has argued that, even had the lower court admitted Hoke's testimony, this would not prove that escorts engaged in advocacy (Oppo. at 55), thus confirming the City's interpretation of "advocacy" to exclude these types of statements.

The City's interpretation and policy as expressed in its briefs and its interpretation and policy in its deposition testimony are entirely consistent. Both represent the City's binding, authoritative interpretation of the Ordinance for purposes of Hoye's facial challenge.

The assertion of the City and the lower court that authoritative interpretations are a one-way ratchet that may only be used to save a statute leads to ludicrous results. According to this theory, a town could, for example, pass a law restricting residential picketing, but, in order to quell opposition from labor unions, publicly declare that the law will not be enforced against labor picketers. A non-union picketer could sue, and in discovery, the town's official representative confirm that the town intends to apply the law to non-labor pickets only. Under the City's restrictive view of facial challenges, the plaintiff would be limited to bringing an as-applied challenge against the town, and even that would fail unless the town already enforced the law in a "pattern of unlawful favoritism."  To avoid such absurdities, *Brown v. City of Pittsburgh*, 586 F.3d 263, 293 n.37 (3d Cir. 2009) sets forth the analytical framework consistent with First Amendment principles of allowing "direct evidence of an explicit policy" to make out a facial challenge.

II. The Ordinance Is Unconstitutional As Applied.

### A. The Ordinance is Viewpoint-Based.

The City resorts to circular reasoning in addressing Hoye's challenge to the Ordinance as being viewpoint-based as applied. It states that the Hoye must show a "pattern of unlawful favoritism" by the City allowing escorts to "violate the Ordinance with impunity." Oppo. at 29.[9] At the same time, however, the City argues that "escorts acting as escorts" presumptively never approach for any forbidden purpose but merely to "facilitate access." (Oppo. at 30). Thus, escorts never violate the Ordinance as interpreted and applied by the City. Q.E.D.

The City argues that speech "facilitating access" is by definition viewpoint-neutral because *Hill* upheld an ordinance passed to help women access health services. Oppo. at 29-30. However, while a governmental interest may be

---

[9] The Supreme Court has only once required that a plaintiff demonstrate a "pattern of unlawful favoritism," in *Thomas v. Chicago Park Dist.*, 534 U.S. 316, 325 (2002), in which the court declined to strike down a permit scheme on its face on the grounds that it was insufficiently precise. The Ninth Circuit has consistently cited *Thomas* in the same context of challenges to permit schemes. See, e.g., *Long Beach Area v. City of Long*, 574 F.3d 1011, 1029 (9th Cir. 2009); *G.K. Ltd. Travel v. Lake Oswego*, 436 F.3d 1064, 1084 (9th Cir. 2006). Thanks to the First Circuit and the abortion issue, however, "pattern of unlawful favoritism" (like "secondary effects") has jumped the species barrier and is here invoked by the City and the lower court as the sole method of bringing an as-applied challenge to a viewpoint-based law. Thus, rather than citing the government's unambiguously stated enforcement policy, a plaintiff must be arrested and possibly jailed several times before he can successfully challenge the law.

viewpoint neutral, a speech restriction that distinguishes between private speech furthering that interest and private speech that does not further that interest is not viewpoint-neutral. For example, a city could pass a ban on posting signs on telephone poles to serve the City's interest in aesthetics. The City could not, however, exempt from that ban only those signs that arguably further the City's interest in aesthetics (e.g., "Keep Our City Beautiful;" "Don't Be A Litterbug;" "Support the Symphony").

The City next argues that "escorts acting as escorts" are exempt because they do not approach "for the purpose of" engaging patients in conversation; rather their speech is "secondary and incidental" to their approach. Oppo. at 30.

The City attempts to distinguish *Foti v. Menlo Park*, 146 F.3d 629 (9th Cir. 1998), on the basis that it is the approaches that are purposeful, and therefore *Foti* is inapposite. On the contrary, *Foti* controls. *Foti* looked at two actions: parking cars with signs for the purpose of communicating, and parking cars with signs for a purpose other than communicating. Menlo Park prohibited the former and allowed the latter, thus unconstitutionally elevating incidental over purposeful speech. *Foti*, 146 F.3d at 639. Here, there are two sorts of speaking approaches: speaking approaches made for the purposes of communicating, and speaking approaches made (purportedly) for a purpose other than communicating. The City prohibits

the former and allows the latter, thus elevating incidental speech over purposeful speech. *Foti* is on all fours.[10]

The City argues that "counseling" as used in the Ordinance should be understood as "advocating or attempting to persuade" and that the escorts' "established policies and practices . . . eliminate pro-choice advocacy." Oppo. at 32-33.

Even if this distinction between advocacy and non-advocacy were constitutionally tenable, which it is not, the City demonstrates that it has a very distinctive, narrow, and convenient definition of "advocacy" as applied to escort speech.[11] The escort must be talking to patients "about their medical decision" and "counseling patients regarding what they should do once inside the clinic." Oppo.

---

[10] The City's "purposeful/incidental" argument, taken to its logical end, means that escorts can approach and say anything to patients, including that which the City itself concedes would be "counseling" or "advocacy," such as discussing the patient's medical decision. If escort speech is only "incidental" to their main purpose of approaching patients "for the purpose of helping them access clinics," then there would be no limitations on the substance of this "incidental" speech. And indeed, the City testified (without any objections interposed) that "the City's enforcement policy is not to enforce the Bubble Ordinance against escorts acting as escorts," meaning that, as long as they are approaching for the purpose of escorting patients, escorts can say anything they want. ER431:19-23.

[11] Ironically, while the City states that "escorts are not advocates" (Oppo. at 33), the deputy city attorney who drafted the Ordinance referred to them as "advocates" in an e-mail to an abortion clinic director applauding their "creative" and "effective" use of signs to block Hoye. ER476

Page 24

at 33; 34 n.17. For Mr. Hoye however, forbidden advocacy includes saying, e.g., "God loves you and your baby." Escorts saying "Don't listen to the demonstrators" is not advocacy. But Mr. Hoye saying, "Don't listen to the escorts" is forbidden advocacy. Escorts telling patients that the demonstrators' literature is inaccurate and meant to harm them is not advocacy. But Mr. Hoye saying, "May I talk to you about alternatives?" is advocacy. Escorts saying "Everything is going to be all right. Come with me," is not advocacy. Mr. Hoye saying, "Please don't go into the clinic" is advocacy. AOB at 11-13. The City's "advocacy" element is simply another blind behind which to hide the viewpoint-based nature of the Ordinance.

### B. As Applied, the Ordinance Fails to Leave Open Ample Alternatives and Is Not Narrowly Tailored To Serve A Significant Governmental Interest.

#### 1. Interference by Escorts Prevents Effective Communication Under the Ordinance.

In reciting the "ample" alternatives remaining to Hoye while the Ordinance is enforced, the City ignores the impact of the escorts on these alternatives. The undisputed evidence shows that escorts routinely block Hoye and other pro-life speakers from communicating with women.[12] As one escort testified, Hoye is

---

[12] The City cites to no evidence in the record that this obstructive activity has

"attempting to, you know, hand out literature and talk to them and I'm attempting to, you know, prevent him from doing so." ER631:8-11; see also, AOB at 8; ER479-480. The City is not only aware of this blocking; it applauds it. ER476 (e-mail from Supervising Deputy City Attorney to clinic director).

While the City proposes a number of communication methods that are still theoretically available ("speaking, shouting, or displaying signs across the eight foot buffer"), Hoye's goal is to thoughtfully discuss alternatives with women and he can only do this by engaging in a one-on-one discussions with them. However, he cannot get permission to do so because the of the gauntlet of escorts who approach without consent and actively dissuade and prevent women from interacting with him.

As to leafleting, the City is willing to allow Hoye to stand at the entrance to the abortion clinic with his hand already outstretched as people walk by. Oppo. at 46-47. Again, the City conveniently ignores the conduct of the escorts, who systematically block Hoye. While Hoye is frozen in place, with his arm sticking out, escorts can stand in front of him and prevent any passerby from seeing, much

---

ceased apart from the lower Court's aside at ER15 that "the City represented at the motion hearing that [escorts blocking Hoye's sign with blank cardboard] has ceased." Regardless, it is undisputed that the other obstructive escort conduct, such as forming barriers with their bodies and drowning out Hoye's voice, continues unabated.

less being able to take his literature. In fact, a similar scenario was described by an escort in celebrating his success in preventing a stationary Hoye from reaching patients. ER732-33 (e-mail dated 2/26/08: "when a patient came i moved to be in front of his sign. neither of us moved outside of a little 3 foot patch on concrete by that tree. . . . my standing next to walter was extremely effective. he never got more than a 'hi' out. he also never moved. patients never came close to him and Phyllis and myself did a good job of blocking his sign"). *See also* ER768, ¶5 (Kendall Decl.) ("the escorts stand directly in front of me to block patients from seeing me and from being able to speak to patients and offer literature"); ER480 (Hoye Dec.) (escorts "form barriers").

Hoye dare not try to move or reach around the escort, because he would then be "approaching" the patient. But the escorts can move around as much as they like to ensure that they are always blocking Hoye, all the while "facilitating access" by warning patients to steer clear of the dangerous nutcase standing with his arm sticking out. Also, any maneuvering by Hoye with his arm outstretched could easily result in him being charged with assault and/or obstructing access to the clinic.

The City has never disputed that escorts systematically work to prevent and disrupt communication between Hoye and patients. Their only response to this undisputed fact is to claim that the escorts are not always successful.

The ongoing presence of escorts systematically interfering with Hoye's expressive activity under the strictures of the Ordinance is an example of a "special problem"[13] that nullifies the purported "ample alterative channels of communication" for Hoye to effectively communicate with his intended audience. See AOB at 39-40. The City "has no such authority to license one side of a debate to fight freestyle, while requiring the other to follow Marquis of Queensberry rules." *R.A.V. v. St. Paul*, 505 U.S. 377, 392 (1992).

### 2. The City Distorts the Purported Record of "Successful" Communication Under the Ordinance.

The City repeatedly distorts the evidentiary record in its effort to claim that Hoye and other can still effectively communicate with patients:

● The cited video (Oppo. at 47) shows Hoye having a conversation with a **man leaving** the clinic building. However, video footage submitted by plaintiff shows numerous instances of escorts blocking Hoye and interposing themselves between him and patients. *See* video clips contained on the DVD filed as Exhibit D to Declaration Of Michael Millen In Support Of Plaintiff's Motion For Summary Judgment, referenced at ER381, ¶5 and ER487, ¶2). The remainder of the several hours of video footage taken on April 29 and May shows escorts

---

13 *Hill*, 530 U.S. at 730.

Page 28

actively interposing themselves between Hoye and any potential **patient** entering or leaving the building. *See* the four DVDs filed as Exhibit A to Declaration Of Terry Thompson, Esq. In Support Of Plaintiff's Opposition to Defendant's Motn. For Summary Judgment, referenced at ER743, ¶3. [14]

● Mrs. Arnold's testimony (Oppo. at 12, 13-14, 47) was about the situation **before** the Ordinance passed. She never attempted to engage in sidewalk counseling at the clinic after the Ordinance came into effect. ER77-78, ER79-82, ER86.

● Similarly Mrs. Hitchcock (Oppo. at 12, n.9, 13, 47) testified to saving babies **before** the Ordinance passed. She specifically stated that she was not aware of any women changing their mind about abortion since the Ordinance came into effect, and that it is "extremely difficult" to reach women under the Ordinance and her ability to effectively communicate "has been reduced to almost nothing." ER761, ¶20-21.

---

[14] Particular clips demonstrating this may be found at the following timestamps: Video of April 29, 2008: 00:04:45-00:05:02; 00:12:30-00:13:00; 00:33:50-00:34:15; 00:56:00-00:56:15; 1:00:10-1:00:40; 1:05:25-1:05:42; 1:17:05-1:17:15; 1:34:37 – 1:34:44; 1:44:05- 1:44:20. Video of May 13, 2008: 1:16:20-1:16:50; 1:45:06-1:45:18.

● Hoye testified that, while he has had some success in engaging women in conversation since the Ordinance passed, his successes in engaging women in conversation have been "much less." ER739-740.

Finally, the assurances of the City's declarants as to how adequately Hoye and others can still communicate with patients is of dubious value, given that they consider **any** such communication harmful, harassing, intimidating and in need of being blocked. AOB at 8-9.

### 3. While Denying Plaintiff the Ability to Effectively Communicate His Message, the City Demands Special Accommodation for Abortion Clinics.

The City states that Hoye's "preferred method of discourse" is "unreasonable given the contested, politicized space in front of clinics," and that Hoye should not assert "overly-specific expressive rights in a sensitive turbulent environment."[15] Oppo. at 49. In sum, the City contends that Hoye's desire to engage in the most fundamental, pristine form of First Amendment activity, person-to-person communication in a public forum, is "overly-specific." In the same breath, the City contends that abortion businesses should be given special consideration not

---

[15] Hoye does not believe this is a "given." In his experience, and that of other sidewalk counselors, the space is not contested, politicized, or turbulent until the arrival of escorts makes it so. ER478-79. So much of the City's arguments rests on this "given" that the paucity of the evidence to support it is striking. *See* Section IIC,

extended to other locales. The City deems Hoye's need of a specific form of expression "unreasonable" but accommodates abortion clinics alleged need for special protection.  Paradoxically, in enacting and defending the Ordinance, the City is encouraging precisely those methods of protest which contribute to a "turbulent" environment, while prohibiting Hoye's thoughtful, one-on-one conversations.

### C. The Ordinance Is Not Narrowly Tailored.

#### 1. The Ordinance Was Directed at Hoye's Activity, Not That of Phantom Protestors.

The City asserts that the Ordinance should be judged not by reference to Hoye's activity, but to that of all potential protestors. Oppo. at 49.  The Supreme Court cases cited, however, deal with the problems created by sheer numbers engaging in certain activities, i.e., leafleting at a state fairground and camping in Lafayette Park.  This is a far cry from the City here claiming that restrictions on Hoye's and others' peaceful activity can be justified by reference to the imaginary misconduct of other "potential" protestors.

The uniformly peaceful  nature of Hoye's conduct can be seen from the video footage of April 29, 2008. *See* the two DVDs marked "April 29, 2008" filed as Exhibit A to Declaration Of Terry Thompson, Esq. In Support Of Plaintiff's

---

*infra*.

Opposition to Defendant's Motn. For Summary Judgment, referenced at ER743, ¶3.
The clinic director and an escort described his conduct as "more aggressive than
usual" on that day. ER621:13-22; ER643:7-11; ER709:16–ER710:11. *See also*
ER732 (Hoke e-mail) ("Walter's stock and trade [sic] is controlling with his phony
friendliness and smarmy charm"); ER633 (Kasdin testimony) (Hoye "always . . .
says something about options or something to that effect and hands literature to
them").

The City contends, however, that there is an "extensive record of harassment,
obstruction, and violence" at Oakland clinics.  Oppo. at 50.  The proffered evidence,
however, consists of repetitive citations to the same self-serving and conclusory
declarations of indisputably biased witnesses, i.e., abortion clinic employees,
including much discussion of unlawful conduct the Ordinance is in no way designed
to address. Oppo. at 3-5.  The City also cites the declaration councilwoman Nancy
Nadel for the proposition that, prior to the passage of the Ordinance, protestors'
tactics escalated and available measures to protect patients became futile. *Id*. The
Nadel declaration says neither. ER303.

The documentary evidence provided actually undercuts the statements in the
declarations and the embellishments by the City. For example, the City states that
the protestors "routinely" engage in harassing and intimidating behavior (Oppo. at

3) and then cites four photographs, three of which are from 1997 or 1998, while the fourth is undated and in any event innocuous. The incident reports attached (which Hoye objected to as hearsay and unauthenticated, ER551) are dated from six to ten years prior to the passage of the Ordinance, with the exception of three dated **after** the Ordinance passed.

The dearth of evidence is particularly significant in light of the fact that both clinic director Jackie Barbic and clinic manager Tammy Cole described in some detail their regular routine for documenting the protestors' behavior. ER194, ER200 (Barbic Dec.) ("Whenever the protestors are outside, a member of my staff takes pictures . . . It is part of our regular course of business to keep these photographs in a file at Family Planning Specialists"); ER314 (Cole Dec.) ("It is clinic policy to take pictures of the protestors whenever they are outside. . . I try to get a picture of their face so that law enforcement officials can identify the protestors. I also try to take photographs when the protestors approach cars or patients").

The adverse inference rule applies here. When a party, or a non-party interested in the outcome of a case, "has relevant evidence in his control which he fails to produce, that failure gives rise to an inference that the evidence is unfavorable to him." *Singh v. Gonzales*, 491 F.3d 1019, 1024 (9th Cir. 2007);

*Carolina Power & Light Co. v. Uranex*, 451 F.Supp. 1044, 1055-56 (N.D. Cal. 1977) (applying adverse inference rule to non-party interested in outcome of the case).

While devoid of corroborating evidence of an "extensive history" of protestor misconduct, the record contains ample evidence that the Ordinance was specifically directed at Hoye's own conduct of peacefully approaching and speaking to patients. Captain Toribio, whose command area includes three of the four abortion clinics in Oakland, testified that he was unaware of protest activity at any clinic other than Family Planning Specialists ("FPS"), where Hoye goes. ER726. He testified that there were "infrequent events" at abortion clinics prior to the implementation of the Ordinance, "infrequent" meaning fewer than one a year. AOB at 61. All but one of the declarations offered by the City pertain to activity at FPS; the remaining one pertains to a clinic that is now closed. At a meeting in March 2008 between law enforcement, the city attorney's office and abortion clinic representatives to discuss implementation of the Ordinance, Hoye was the only pro-life demonstrator discussed. ER729:3-23.

FPS clinic manager Cole stated, "Before the Ordinance passed . . . . [t]here were usually only four protesters, one of whom was Walter Hoye." ER314 ¶9. The others were Elga Kendall, Christiana Downer, and Virginia Hitchcock. ER764;

ER768. *See also* ER198 (Barbic Dec.) (before Ordinance passed, protesters came only on Tuesdays); ER642 (Barbic testimony) ("it was kind of quiet up until [2006],")

While the City might theoretically justify the Ordinance as narrowly tailored to deal with protestor conduct other than Hoye's, it must do more than simply assert the relevant governmental interests the Ordinance purports to serve. It must present "tangible evidence" that the Ordinance is "necessary" to advance the asserted interests. *Edwards v. Coeur d'Alene*, 262 F.3d 856, 863 (9th Cir. 2001). There is no "tangible evidence" of any conduct of protesters other than Hoye and his companions at Oakland clinics in the years preceding passage of the Ordinance to justify the Ordinance. Further, the suggestion that Hoye and his companions' conduct was anything but peaceful, non-obstructive, and respectful of patients is disputed by their own declarations, the video evidence, and the testimony of the clinic escorts themselves. Further, the fact that, prior to passage of the Ordinance, Hoye was able to approach and help several women who were grateful for his assistance is undisputed. ER478-479.

<u>2. More Precise Means of Serving the Asserted</u>
<u>Interests Are Available.</u>

Amicus Planned Parenthood Mar Monte (PPMM) undercuts the City's

argument that the Ordinance is necessary to serve the City's asserted interests.

PPMM "has found San Jose's buffer ordinance helpful in protecting the privacy

rights of its patients accessing its San Jose health center." Amicus Brief of Planned

Parenthood Affiliates of California et al. ("PPAC Brief") at 3. The San Jose

ordinance, rather than prohibiting all unconsented approaches, only prohibits

"failing to withdraw immediately to a distance of at least eight feet away from any

person **who has requested such withdrawal**." San Jose Municipal Code

§10.08.030(a) (emphasis added). Restrictions that disregard far less restrictive,

more precise, and feasible means to advance the asserted governmental interest are

not narrowly tailored. *Project 80's Inc. v. Pocatello*, 942 F.2d 635, 638 (9th Cir.

1991).

<u>3. The Record Showed No Inadequacy in Existing</u>
<u>Laws or Enforcement.</u>

Planned Parenthood argues that existing laws are inadequate to protect access

and that the Ordinance is a "critical" tool. PP Brief at 20-21. This assertion finds no

support in the record. Indeed, this argument only serves to highlight "the dog that

didn't bark" in this case. Unlike in Colorado and Massachusetts, the record here is devoid of any testimony, statements, reports, or other evidence from law enforcement suggesting that the Ordinance is or was thought to be a critical, helpful, or even desirable tool. Nor is there any suggestion that law enforcement believed they were in any way under-equipped to deal with abortion protesters. No officer could make such assertions because, as discussed supra, Section IIC(1), in the years leading up to the passage of the Ordinance, Hoye and his elderly companions were the only regular pro-life speakers outside any abortion clinic in Oakland. There was no problem to be solved. The only "harm" these individuals caused was annoying clinic personnel with their quiet persistence.

### III. THE ORDINANCE IS UNCONSTITUTIONALLY VAGUE.

The City asserts that it is clear "what the ordinance as a whole prohibits" (Oppo. at 51), while conceding that "a variety of factors must be evaluated to determine whether a violation has occurred." (Oppo. at 10). *Cf. Berger*, 569 F.3d at 1047 (myriad of factors for officer to consider in discerning intent lends ordinance to discriminatory enforcement).

It is clear what the City **wants** the Ordinance to prohibit: as much of Mr. Hoye's speech activity as it can stretch the Ordinance to cover. See AOB at 46-50. However, the City's wishes do not provide an adequate guide for Hoye to follow to

avoid being sent to jail for a year at a time.  Facile assertions that the Ordinance is clear do not make it so, as shown by the City's failure to answer basic questions, e.g., about how to determine whether a parked vehicle is "seeking entry" to a facility. These are not "hypertechnical theories" but recurring scenarios.  ER481 ¶18.

The City asserts that the Ordinance does not prohibit approaching an escort of a consenting patient, because the protestor "violates the Ordinance only when he or she **intends to communicate** with the person he or she is approaching." Oppo. at 52 (emphasis added).  However, the City presumes that "anyone holding a sign **intends to communicate** with anyone who can see the sign." Oppo. at 46 (emphasis added). So the City presumes the protestor intends to communicate with the escort, unless, the City states, the presumption gives way in the face of consent by a patient. But what if the patient has not yet consented?  What if the protester is still trying to get the consent of the patient who is being escorted?  He or she apparently must still stay more than 8 feet away **from the escorts** walking with the patient while doing so. ER420:10-24.

The City states, without explanation, "The Ordinance as a whole does not prohibit approaching an escort standing in front of a clinic to engage in casual conversation." Oppo. at 52. In fact, the Ordinance on its face does not prohibit

approaching stationary escorts without consent to speak to them, as stationary escorts are by definition not "seeking to enter" the clinic and therefore are not covered by the no-approach provision. However, the City reads into the Ordinance a prohibition on approaching stationary escorts (ER418:16-ER419:25; ER459:24-ER461:2; ER638:11-26; ER639:3-22) and then reads into this non-existent prohibition an exception for "casual conversations." Thus, if Mr. Hoye wishes to share his religious beliefs or implore the escort not to interfere with his attempts to speak to women, he has no safe harbor from this imaginary prohibition other than the City's brief.

### IV. THE LOWER COURT ERRED IN GRANTING SUMMARY JUDGMENT TO THE CITY.

The lower court greatly deviated from the evidentiary standards governing summary judgment motions. This is shown by a comparison of the court's treatment of problematic escort conduct with its treatment of the "evidence of historical access problems" by pro-life demonstrators (ER7 n.3).

The evidence of escorts blocking Hoye was (1) recent, (2) reliably documented in an objective form (video) in addition to e-mails from to and from participants in the activity and (3) admitted to, rather than disputed by, the escorts themselves in sworn testimony. The evidence also showed that this blocking was

(4) deliberate, (5) frequent, i.e., engaged in repeatedly and systematically on the

particular days recorded, and occurring repeatedly over months and years, (6)

carried out by persons trained to engage in the conduct, and (7) organized and

coordinated. Finally, the evidence showed that (8) the City was aware of the

conduct and not only took no steps to stop it, but actually encouraged it.

Yet the lower court dismissed this evidence by focusing solely on one form of

interference (escorts blocking Hoye's sign with blank signs), then declaring this

activity "sporadic" and noting the City represented it had ceased. ER15.

Contrast this with the lower court's treatment of the "evidence of historical

access problems." The City's evidence of demonstrators interfering with access was

(1) frequently outdated, if it was dated at all, (2) based on hyperbole-fortified

declarations or statements from indisputably biased witnesses[16] and a handful of

unauthenticated[17] photographs that showed no blocking or aggressive approaches,

and (3) specifically disputed and denied by Hoye and the only other pro-lifers who

were regularly going to an abortion clinic in Oakland in the years preceding passage

of the Ordinance. ER752- ER754; 758-ER759; ER764-ER765; ER768-ER769.

---

[16] Two of the witnesses whose testimony the lower court singled out for special
mention (ER4) gave testimony at Hoye's criminal trial that was contradicted by the
video evidence. ER771-ER775.
[17] ER549 (Plaintiff's Objections to Evidence)

The City's declarations were nonspecific as to the frequency of any of the alleged bad conduct. There was no evidence that over the years of purportedly "historical access problems," demonstrators were coordinated, trained, or otherwise systematically interfering with access. On the contrary, the only specifics showed widely divergent forms of activity.

Finally, and most importantly, there no evidence that law enforcement was unable or unwilling to take action to "protect access" using existing laws, or that existing laws were inadequate for that purpose.[18]  Indeed, the record shows that, over the decades, various individuals have been prosecuted.

Thus, an even-handed summation of the evidence, much less a summation construing the evidence in favor of the non-moving party, would conclude that, **unlike** the frequent, regular acts of interference by escorts, acts of anti-abortion demonstrators interfering with access "have been discontinued and were sporadic when they occurred."  Cf. Oppo. at 34.

---

[18] The lower court's reliance on an alleged (undated) clinic blockade involving 300 persons in support of "historical access problems" is particularly striking. ER4. Notably, the record does not say what happened to the blockaders. To suggest that police were unable to deal with the situation for lack of a law prohibiting unconsented approaches within 8 feet is ludicrous.

The City cannot have it both ways. If the City's spotty, disjointed, uncorroborated, and disputed evidence of "historical access problems" is a sufficient basis for finding the Ordinance narrowly tailored to serve a significant governmental interest, then Hoye's far more compelling evidence of systematic escort interference with his expressive activity defeats the City's purported showing of ample alternative channels of communication available under the Ordinance as applied. Conversely, if Hoye's evidence of escort misconduct can be brushed aside as "sporadic" and apparently "discontinued," then the same conclusion amply applies to the City's evidence of misconduct by anti-abortion speakers supposedly necessitating the Ordinance.

### V. RELIANCE ON EUROPEAN OR CANADIAN LAW IS INAPPROPRIATE

Amici American College of Obstetricians and Gynecologist et al. ("ACOG") urge this Court to consider European and Canadian law in evaluating the constitutionality of the Ordinance, citing a single decision from the European Commission on Human Rights concerning an injunction imposed against a particular individual, and a law passed by the legislature in British Columbia.

ACOG asserts that the four-prong test for speech restrictions under the European Convention "is similar to the 'time, place, and manner' test used by the

Supreme Court." ACOG Brief at 19.  On the contrary, the European Convention test contains none of the distinct elements of the Supreme Court's test: content-neutrality, narrow tailoring, or ample alternative channels of communication. The European test merely asks whether the restriction "has a legitimate aim" and "is necessary in a democratic society." *Id.* at 17. In other words, unlike the First Amendment's precise limits on speech restrictions, the European Convention contains no measurable protection for societally disfavored speech.

British Columbia's "Access to Abortion Services Act" presents an even starker contrast to our First Amendment freedom. The law makes it a crime within 100 feet of abortion clinics, inter alia, to "engage in sidewalk interference" or "protest." "Sidewalk interference" is defined as "(a) advising or persuading, or attempting to advise or persuade, a person to refrain from making use of abortion services,[19] or (b) informing or attempting to inform a person concerning issues related to abortion services, by any means, including, without limitation, graphic, verbal or written means."  "'Protest' includes any act of disapproval or attempted act of disapproval, with respect to issues related to abortion services, by any means, including, without limitation, graphic, verbal or written means." Revised Statutes of British Columbia  (R.S.B.C.) 1996, c. 1 §§ 1, 2(1).

---

[19] This language is similar to the language in the Ordinance as originally passed by

The Access Act is utterly repugnant to the First Amendment. While the Supreme Court has spent decades developing standards and tests to weed out laws that "create an unacceptable **risk** of the suppression of ideas," *City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 797 (1984) (emphasis added), the Access Act boldly embraces the very purpose of suppressing ideas. It stands foursquare against the most fundamental principle of the First Amendment, that the government may not restrict speech based on disapproval of the ideas expressed. *R.A.V.*, 505 U.S. at 382. The fact that the Access Law is consistent with the Canadian Charter but would be found inconsistent with the United States Constitution simply reflect the different central values the two societies hold.

Consulting Canadian law for the purpose of interpreting the First Amendment's Freedom of Speech Clause would be like looking to countries with state-established churches for guidance on interpreting and applying the Establishment Clause, or laws in jurisdictions that permit warrantless searches of homes for guidance on interpreting the Fourth Amendment. The only guidance to be found in a polar opposite is to steer directly away from it.

---

the City. ER494 (Section 2(f)).

## VI. CWLC MISREPRESENTS THE FINDINGS OF THE CITED STUDIES

CWLC states that the study by Cozzarelli et al., found that exposure to demonstrators "can significantly exacerbate stress and negative affect in women." CWLC Brief at 24. However, the cited study does not discuss stress as a reaction to anti-abortion picketing. Undeterred, CWLC goes on to erect a whole structure of further potential consequences based on this non-existent premise of increased stress. CWLC Brief at 24-25. CWLC also cites the Cozzarelli study for the proposition that "being blocked by anti-abortion protestors elevates immediate post-abortion depression levels." *Id.* at 27. CWLC omits mention of the study's conclusion that this depression was short-lived and minor, and that "encountering antiabortion picketers on one's way into an abortion clinic does not appear to pose a significant long-term mental health risk to women." Cozzarelli at 274.

CWLC states, "Emotional distress caused by forced physical proximity also influences a patient's ability to absorb information," citing a study by Polk-Walker. CWLC Brief at 26. In fact, the cited study never mentions physical proximity as a source of distress. What the study does say is that anxiety about the abortion procedure, as expressed in a desire for general anesthesia, may indicate ambivalence about the abortion decision itself, a possibility which should be explored by further counseling before the procedure is performed. The author states that "it is important

for [the patient] to acknowledge that the procedure, while similar to other minor surgeries performed under general anesthesia, is different – the consequence remove [sic] the potential for another life." Glenda C. Polk-Walker, Counseling Implications in a Client's Choice of Anesthesia During a First or Repeat Abortion, 28 NURSING FORUM Issue 1 at 22, 26-27 (1993). This suggests that pro-life speakers who attempt to communicate with women about their decision as they approach the clinic can help these women by bringing to the surface latent ambivalence about their abortion decision. Such ambivalence is better addressed by further counseling **before** the abortion, whether or not the woman ultimately decides to go forward with the procedure.[20]

CWLC asserts that delay in obtaining abortions "causes great physical harm." This is a curious assertion, as abortion advocates have long contended that abortion is a very safe medical procedure. *Tucson Women's Center v. Arizona Medical Bd.*, 2009 U.S. Dist. LEXIS 95275 at *33 (D.Ariz. 2009) (abortion provider and expert witness declare that "abortion at any stage is considered to be one of the safest surgical procedures").  It is doubtful that clinics warn every woman who reschedules her abortion appointment a week later that the abortion may now cause "great physical harm"   Similarly, if the woman eight weeks pregnant who

---

[20] *See also* Cozzarelli (cited by CWLC) at 274: ("women who are conflicted about

reschedules her appointment for two weeks later is at such increased risk, a clinic would need to inform the woman who first comes in at ten weeks told that her abortion is "risky" and that she faces "great physical harm."[21]  There is no evidence that clinics say anything of the sort.

Abortion proponents want to have it both ways:  Any abortion a woman has today is the one of the safest surgical procedures available, but if she waits a week, the procedure is fraught with risk and may lead to "great physical harm."

As the District Court pointed out in *Tucson Women's Center*, confronted with identical evidence of the "danger" and "harm" of delayed abortions as presented here, an increase of  "38% of a very small number is still a very small number."  *Id.*

### VII. AMICI CANNOT RECONCILE THE DATA WITH THEIR CONCLUSION

As the amici amply demonstrate, abortion protests have been going on for decades, all across the country. Most women seeking abortions encounter protesters on their way into the clinic. PP Brief at 6-7. Thus, the situation in Oakland was nothing out of the ordinary. Indeed, as discussed above, the record indicates that protester activity in Oakland was  and is considerably less than the ordinary.

---

abortion seem especially vulnerable to negative postabortion sequalae").

[21] *See also*, Jacot et al., A Five-year Experience with Second-Trimester Induced Abortions:  No Increases in Complication Rate as Compared to First Trimester, 168[2] Am. J. Obstet. Gynecol. 633 (Feb. 1993).

Amici pile premise upon premise (protesters cause more anxiety; anxiety leads to more pain; pain leads to more anesthesia, delay, etc.) to reach the conclusion that abortion protests endanger women's health. However, the inescapable fact is that, despite the vast majority of abortion patients nationwide encountering protesters (and encountering them without a no-approach law in place), abortion proponents maintain that abortion is one of the safest medical procedures available. *See, e.g., American Academy of Pediatrics v. Lungren*, 16 Cal.4th 307, 362-63 (1997) ("abortion is one of the safest medical procedures available for all women and, in particular, for teenagers. . . . Minors rarely, if ever, experience complications following an abortion"). Nothing proffered by the City or amici suggests that the presence of abortion protestors has damaged this record.

## CONCLUSION

Preservation of a right to abortion is not dependent upon the suppression of the speech of those who dare to believe abortion is not in fact a necessary, moral, or healthy choice and consequently seek to engage women in thoughtful conversations about it. Walter Hoye respectfully asks this Court to reverse the lower court's order granting summary judgment to the City and direct the court to enter a new order granting Hoye's motion for summary judgment and enjoining enforcement of the

Ordinance.

Respectfully Submitted,

Dated:  March 2, 2010          By:_____

MICHAEL MILLEN
ATTORNEY FOR APPELLANT

## STATEMENT REGARDING LENGTH

## (Fed. R. App. P. 32 (a)(7)(C) and Ninth Circuit Rule 32-1)

This brief is proportionately spaced, has a typeface of 14 points or more and contains 10,650 words.

Respectfully Submitted,

Dated:  March 2, 2010          By:_____

MICHAEL MILLEN
ATTORNEY FOR APPELLANT

<u>Certificate of Service</u>

DOCUMENT(s): Reply Brief of Plaintiff-Appellant Walter B. Hoye II

The undersigned hereby certifies that he is a member in good standing of the bar of this court, not a party to this action, and is employed at 119 Calle Marguerita #100, Los Gatos, CA 95032.

Except for those noted below as being served by United States mail, all persons on this case's Service List are Active ECF filers

The document(s) listed above were served this date by placing a copy in the United States mail, with first class postage-prepaid thereon, addressed to:

N/A

I declare under penalty of perjury under the laws of the United States and the

State of California that the foregoing is true and correct.

Dated: March 2, 2010      By:_____

MICHAEL MILLEN